# Exhibit A

## DEFINITIVE SETTLEMENT AGREEMENT

THIS DEFINITIVE SETTLEMENT AGREEMENT (the "Definitive Settlement Agreement") is entered into as of this _25_ day of _MARCH_ 1998 by and among C.R.I., Inc., a Delaware corporation ("CRI"), William B. Dockser, an individual residing in the State of Maryland ("Dockser"), H. William Willoughby, an individual residing in the Commonwealth of Virginia ("Willoughby"), Martin C. Schwartzberg, an individual residing in the State of Maryland ("Schwartzberg") and Capital Management Strategies, Inc., a Delaware corporation ("CMS").

WHEREAS, prior to January 1, 1990, Dockser, Willoughby, and Schwartzberg were the sole shareholders of all of the common stock of CRI and Dockser, Willoughby and Schwartzberg were the principal shareholders of common stock of certain other corporations engaged in businesses substantially similar to or related to that of CRI; and

WHEREAS, CRI was the sponsor of numerous public and private offerings of interests in limited partnerships (the "Investment Partnerships"), which either acquired interests in limited partnerships (the "Local Partnerships") which are the owners of apartment complexes, office buildings, hotels and other businesses which operate developed real property or, in a few cases, acquired interests in intermediate limited partnerships which own interests in Local Partnerships; and

WHEREAS, as a result of the development, syndication, ownership and operation of the commercial and residential real estate of CRI and the CRI Businesses (as hereinafter defined), Schwartzberg was a general partner in each of the limited partnerships listed on Schedule I attached hereto and made a part hereof by this reference and in certain other limited partnerships affiliated with those partnerships so listed; and

WHEREAS, effective as of January 1, 1990, CRI, Dockser, Willoughby, Schwartzberg and CMS, among others, entered into a series of agreements pursuant to which (i) Schwartzberg agreed to sell and thereafter sold and CRI, Dockser and Willoughby agreed to purchase and thereafter purchased the common stock in CRI and the common stock in certain other corporations engaged in businesses substantially similar to or related to that of CRI as set forth in the Stock Purchase Agreement dated as of January 1, 1990; (ii) Schwartzberg resigned his positions as an officer and director of CRI and each of said corporations as called for in the Shareholder's Agreement dated as of January 1, 1990; (iii) CRI retained CMS to provide certain asset management services and administrative oversight with respect to certain Local Partnerships and the management of the government-assisted apartment complexes owned by such Local Partnerships as set forth in the Asset Management Agreement dated as of January 1, 1990; (iv) Schwartzberg retired from CRI's businesses and CRI issued and Schwartzberg accepted an

indemnification from CRI for liability as set forth in the Indemnification Agreement dated as of January 1, 1990; and (v) CMS agreed to sublease and thereafter subleased from CRI and CRI agreed to sublease to CMS and thereafter subleased space in the CRI Building as set forth in the Sublease (the foregoing instruments, among others and as amended thereafter, collectively the "Buy-Out Agreements"); and

WHEREAS, CRI, Dockser and Willoughby commenced an action against CMS and Schwartzberg in the Circuit Court of Montgomery County, identified as Civil Action No. 144275 on November 19, 1995; and

WHEREAS, CMS and Schwartzberg filed an action against CRI, Dockser and Willoughby in the Circuit Court of Montgomery County, identified as Civil Action No. 146566 on January 18, 1996; and

WHEREAS, on February 8, 1996, CRI, Dockser and Willoughby filed a Verified First Amended Complaint for Injunctive, Declaratory and Other Relief, and Payment of Damages against Schwartzberg and CMS; and

WHEREAS, Civil Action No. 144275 and Civil Action 146566 were consolidated; and

WHEREAS, on various dates in 1996 and as set forth on Exhibit U, CRI filed twenty-six (26) actions against Schwartzberg in the District of Columbia Superior Court regarding the requisite number of consents necessary to become the Managing General Partner of twenty-six (26) Investment Partnerships; and

WHEREAS, CRI filed numerous Complaints to Compel Arbitration pursuant to the District of Columbia Arbitration Act and on April 12, 1996, the Superior Court consolidated 22 of the pending actions before it and ordered the pending actions, including Capital Housing Partners - IX, to arbitration and stayed the pending actions; and

WHEREAS, on April 15, 1996, CRI filed with the Superior Court of the District of Columbia a Complaint to Compel Arbitration and CRI also filed a Demand for Arbitration with the American Arbitration Association; and

WHEREAS, Schwartzberg has appealed the decision of the Superior Court; and

WHEREAS, on February 15, 1996, Schwartzberg commenced an action in the Delaware Court of Chancery against CRITEF Associates Limited Partnership and CRITEF III Associates Limited Partnership; and

2

WHEREAS, on February 16, 1996, the CRITEF Funds, among others, filed an action in U.S. District Court for the Southern District of New York against Schwartzberg; and

WHEREAS, CRI, Dockser, Willoughby, Schwartzberg and CMS desire to resolve all of the disputes that have arisen between them and in accordance therewith, each of the foregoing persons and entities and Capital Apartment Properties, Inc. (CAPREIT) entered into that certain agreement known as The Solution, dated June 12, 1996, pursuant to which the parties thereto agreed to enter into this Definitive Settlement Agreement and simultaneously therewith Schwartzberg, CMS, CAPREIT, Watermark Partners, L.P., a Delaware limited partnership and Watermark Partners III, L.P., a Delaware limited partnership (CAPREIT and each of the Watermark limited partnerships may be hereinafter referred to collectively as the "CAPREIT Entities") entered into that certain Agreement dated June 12, 1996 (the "Separate Agreement") pertaining to the resolution of disputes with respect to the merger of certain of the CAPREIT Entities into the CRITEF Funds (as hereinafter defined); and

WHEREAS, in connection with the resolution of the disputes, the parties hereto will execute, deliver and perform this Definitive Settlement Agreement and execute, deliver and perform the Exhibits attached hereto as operative instruments memorializing the agreements reached regarding the disputes.

NOW, THEREFORE, in consideration of the foregoing premises and the respective representations, warranties, covenants, agreements and conditions hereinafter set forth and the Exhibits attached hereto and made a part hereof, and intending to be legally bound hereby, the parties hereto agree as follows:

ARTICLE ONE

Definitions

Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Definitive Settlement Agreement and the Exhibits hereto and the definitions of such terms are equally applicable to both the singular and plural forms of such terms and to the masculine, feminine and neuter genders of such terms.

Advance means the sum payable or paid to Schwartzberg by CRI on an Advance Date (as hereinafter defined) pursuant to Section 5.3 hereof.

Advance Date means each of January 31, 1997, July 31, 1997, January 31, 1998, July 31, 1998, January 31, 1999, July 31, 1999, January 31, 2000, July 31, 2000,

3

January 31, 2001, July 31, 2001, January 31, 2002 and July 31, 2002, and collectively, the foregoing, Advance Dates.

Advance Period means (i) for Advance Dates occurring on a July 31, the immediately preceding six-month period from January 31, through June 30, and (ii) for Advance Dates occurring on a January 31, the immediately preceding six-month period from July 1 through December 31 (except with respect to the first Advance Date on January 31, 1997, for which the Advance Period shall be January 1 through December 31, 1996).

Affordable Housing Property (ies) means those certain apartment complex(es) for low and moderate-income tenants listed on Schedule II owned by Local Partnerships.

Appendix II Statements means those certain statements made by Mr. Schwartzberg or CMS and set forth in Appendix II.

CAPREIT means Capital Apartment Properties, Inc., a Maryland corporation.

CAPREIT Entities means collectively, CAPREIT, Watermark Partners, L.P. and Watermark Partners III, L.P.

CDW Affiliate means any entity now or hereafter controlling, controlled by or under common control with CRI, Dockser or Willoughby including all those Investment Partnerships, Local Partnerships or other real estate partnerships in which CRI, Dockser or Willoughby hold a general partner interest, but specifically excepting the Schwartzberg Partnerships and the four Local Partnerships listed on Exhibit I hereto.

CDW Default means any failure to perform or any violation by CRI, Dockser or Willoughby of any provision of the Definitive Settlement Agreement after the execution date hereof. Where a CDW Affiliate is expressly obligated to act or refrain from acting pursuant to any provision of the Definitive Settlement Agreement, a CDW Default shall also be construed to include any failure to perform or any violation of said provision of the Definitive Settlement Agreement by such CDW Affiliate.

CHP(s) means each partnership sponsored by CRI and designated Capital Housing Partners - roman numeral.

Commercial and Market Rate Properties means those certain hotels, office buildings and/or apartment complexes with respect to which the related Investment Partnerships were syndicated by CRI, which properties are listed on Schedule III.

CRI means C.R.I., Inc., a Delaware corporation.

CRI Business(es) means in the aggregate, CRI, all companies controlled by any combination of CRI, Dockser or Willoughby, the Investment Partnerships, the Local Partnerships, CRIIMI MAE and all other partnerships sponsored or entities formed or sponsored by CRI, excluding the Schwartzberg Partnerships.

CRI I-IV means Capital Realty Investors Ltd., a District of Columbia limited partnership, Capital Realty Investors-II Limited Partnership, a Maryland limited partnership, Capital Realty Investors-III Limited Partnership, a Maryland limited partnership, and Capital Realty Investors -IV Limited Partnership, a Maryland limited partnership, each a publicly-held limited partnership that owns partnership interests in Local Partnerships that own apartment complexes and, for purposes of this Definitive Settlement Agreement, each an Investment Partnership.

CRI-85 means Capital Realty Investors - 85 Limited Partnership, a Maryland limited partnership, a publicly held limited partnership that owns partnership interests in Local Partnerships that own apartment complexes and, for purposes of this Definitive Settlement Agreement, an Investment Partnership.

CRIIMI MAE means CRIIMI MAE Incorporated, a Maryland corporation, CRIIMI MAE Services Limited Partnership, a Maryland limited partnership and all subsidiaries and affiliates of any of the foregoing.

CRITEF means Capital Realty Investors Tax Exempt Fund Limited Partnership, a Delaware limited partnership.

CRITEF III means Capital Realty Investors Tax Exempt Fund III Limited Partnership, a Delaware limited partnership

CRITEF Funds means CRITEF and CRITEF III.

Definitive Settlement Agreement means this Agreement, all of the exhibits, schedules, and appendices attached hereto and made a part hereof.

Disposition Fee means that sum earned by, payable to and paid to CRI, Dockser, Dockser's estate, Willoughby, Willoughby's estate or a CDW Affiliate, or to CMS, Schwartzberg, a Schwartzberg Affiliate or Schwartzberg's estate (as applicable, the "Disposition Fee Recipient"), in connection with the sale, refinancing or other disposition of the Affordable Housing Properties and CRI's syndicated Commercial and Market Rate Properties on or after January 1, 1996, from the proceeds distributable regardless of partnership tier, including at the Local Partnership level or the Investment Partnership level, as indicated in the particular disposition documents, less, with respect to the Affordable Housing Properties (other than those in which Schwartzberg Partnerships are Investment Partnerships) and the

Commercial and Market Rate Properties, any and all of the costs and payments due to all unaffiliated third parties (including charges payable by NHP or a successor disposition agent to Schwartzberg or a Schwartzberg Affiliate or 'Schwartzberg's estate). If Schwartzberg subcontracts with NHP to perform disposition services for one of CRI's Affordable Housing Properties, any sums he receives from NHP shall not be considered a Disposition Fee and shall not affect the amount of Disposition Fees he receives from CRI. Disposition Fee shall not include the $42,500 payable to CMS pursuant to Section 5.3(g) in connection with the sale of Park Heights Towers.

Dockser means William B. Dockser.

Escrow Agent means the Escrow Agent under the Escrow Agreement.

Escrow Agreement means that certain agreement entered into and attached hereto as Exhibit A.

Indemnification Agreements means those certain Indemnification Agreements dated of even date herewith, pursuant to which (a) Schwartzberg indemnifies Dockser, Willoughby and CRI against costs and expenses arising out of certain Indemnifiable Events, as defined therein, and (b) Dockser, Willoughby and CRI indemnify Schwartzberg against costs and expenses arising out of certain Indemnifiable Events, as defined therein.

Investment Partnerships means those limited partnerships which were sponsored by CRI or a CRI Affiliate in which interests were offered through public or private placements pursuant to which investors contributed equity to such limited partnerships and which limited partnership thereafter acquired interests in Local Partnerships or intermediate tier limited partnerships, which acquired interests in Local Partnerships.

Lawsuits means (a) CRI, Dockser and Willoughby v. CMS and Schwartzberg, Circuit Court for Montgomery County, Maryland Civil Action No. 144275 (Consolidated with Civil Action No. 146566), (b) Schwartzberg and CMS v. CRI, Dockser and Willoughby, Maryland Court of Special Appeals, Emergency No. 5, (c) Schwartzberg v. CRI, Circuit Court for Montgomery County, Maryland Civil Action No. 150536, (d) CRI v. Schwartzberg, District of Columbia Superior Court, various civil action numbers listed in Exhibit U hereto, (e) CRI v. Schwartzberg, Court of Appeals for the District of Columbia, No. 96-CA-472, (f) Schwartzberg v. CRITEF Funds, Delaware Chancery Court, Civil Action No. 14837, and (g) CRITEF Funds v. Schwartzberg, U.S. District Court for the Southern District of New York, 96 CIV. 1186 (LAK).

Local Partnerships means each of the partnerships which owns improved real property and in which an Investment Partnership or intermediate tier partnership has invested.

6

Mergers means those certain mergers of certain of the CAPREIT Entities into the CRITEF Funds pursuant to those certain Agreements and Plans of Merger, dated as of September 11, 1995, as amended from time to time.

NHP means NHP Incorporated, a Delaware corporation.

Properties means those certain real estate developments owned by Local Partnerships in which Investment Partnerships or intermediate tier partnerships are limited partners.

Public Partnerships means CRI I-IV and CRI-85.

Residuals means the CRI Residuals, the Dockser Residuals, the Schwartzberg Residuals and the Willoughby Residuals, as defined in that certain Convertible Subordinated Loan Agreement dated as of January 17, 1989, by and among CRI and certain related parties and Oak Tree Investment Company.

Schwartzberg means Martin C. Schwartzberg.

Schwartzberg Affiliate means any entity now or hereafter controlling, controlled by or under common control with Schwartzberg or CMS.

Schwartzberg Default means any failure to perform or any violation by Schwartzberg of any provision of the Definitive Settlement Agreement or Separate Agreement after the execution date hereof. Where a Schwartzberg Affiliate or Schwartzberg's estate is expressly obligated to act or refrain from acting pursuant to any provision of the Definitive Settlement Agreement, a Schwartzberg Default shall also be construed to include any failure to perform or any violation of said provision of the Definitive Settlement Agreement by such Schwartzberg Affiliate or Schwartzberg's estate, as the case may be.

Schwartzberg Partnerships means Capital Housing Partners VII, Capital Housing Partners IX, Capital Housing Partners XV, Capital Housing Partners XX, Capital Housing Partners XXXV, Capital Housing Partners XL, Capital Housing Partners LIII, Capital Housing Partners LXXIII, Capital Housing Partners XC, Capital Housing Partners CII, Capital Housing Partners CVIII, and Capital Housing Partners CXXI, each a District of Columbia limited partnership.

Separate Agreement means that certain Agreement dated as of June 12, 1996 by and among the CAPREIT Entities, MCS and CMS, a copy of which is attached hereto as Exhibit B.

Shared Management Agreement means that certain Amended and Restated Agreement Regarding Shared Management Responsibilities, dated as of January 1,

7

1990, by and between Housing Inc., and CRICO Management Corporation as assigned by CRICO Management Corporation to CAPREIT Residential Limited Partnership and by it to CAPREIT Residential Corporation as of January 31, 1994, and as amended in February 1994.

The Solution means that certain agreement dated as of June 12, 1996 by and between Dockser, Schwartzberg, Willoughby, CRI, CMS, and CAPREIT, a copy of which is attached as Exhibit C.

Triggering Schwartzberg Default means any failure by Schwartzberg to perform his obligations under or any violation by Schwartzberg of Section 6.1(b) or Section 6.1(c) hereof.

Willoughby means H. William Willoughby.

### ARTICLE TWO

### EXHIBITS

Attached hereto and incorporated herein by reference are each of the exhibits, appendices and schedules (collectively, the "Exhibits") identified in the Exhibits List. Each of the terms of the Exhibits are incorporated herein by reference as if stated in the body of this Definitive Settlement Agreement. Unless expressly defined in an Exhibit, every Definition in Article I hereof and all terms set forth in the Section captioned "Miscellaneous," Article XII, hereof shall apply to such exhibits as if set forth therein in their entirety. Exhibits N and V are intended to be operative documents only upon their delivery to CRI, Dockser or Willoughby by the Escrow Agent. Any conflict between the terms of this Definitive Settlement Agreement and the following Exhibits shall be governed by the contrary provisions of such Exhibits:

(1) Exhibit A -- Escrow Agreement
(2) Exhibit K -- Agreement Regarding Partnership Transfers (including the Indemnification Agreements attached thereto)
(3) Exhibit N -- Power of Attorney
(4) Exhibit O -- Mutual Release
(5) Exhibit V -- Absolute Assignment

8

## ARTICLE THREE

## PARTNERSHIP TRANSFERS

CRI, Dockser, Willoughby & Schwartzberg hereby agree to execute the Agreement Regarding Partnership Transfers attached hereto as Exhibit K and made a part hereof by this reference.

## ARTICLE FOUR

## EXECUTION DATE

To the extent this Definitive Settlement Agreement requires monies to be paid by any party to Schwartzberg, between June 12, 1996 and the execution date hereof, such sums shall be paid on the execution date hereof, notwithstanding any other provision of this Definitive Settlement Agreement. Reimbursement of fees to Schwartzberg's counsel and consultants shall be as provided for in the Separate Agreement, attached hereto as Exhibit C.

## ARTICLE FIVE

## ALLOCATION OF DISPOSITION FEES

Section 5.1

(a)    Allocation of Disposition Fees with Respect to Affordable Housing Properties.

If, in connection with the sale, refinancing or other disposition of any of the Affordable Housing Properties, a Disposition Fee Recipient is entitled to and receives a Disposition Fee, each of Dockser, Willoughby and Schwartzberg shall be entitled to receive one-third of fifty percent (50%) of such Disposition Fee. The Disposition Fee Recipient shall be entitled to the remaining fifty percent (50%) of such Disposition Fee.

By way of illustration, if CRI received a Disposition Fee of $260,000 in connection with the sale of one of its Affordable Housing Properties, and contracted to pay its disposition agent, NHP, $200,000, CRI would make the following payments:

| | |
|---|---|
| CRI | $30,000 |
| Dockser | 10,000 |
| Willoughby | 10,000 |
| Schwartzberg | 10,000 |

In the above example, if Schwartzberg subcontracted with NHP to perform disposition services for this property, and received $100,000 from NHP, such $100,000 is not a Disposition Fee and does not reduce the $10,000 of Disposition Fees he receives from CRI.

If Schwartzberg received a Disposition Fee of $260,000 in connection with the sale of one of his Affordable Housing Properties, and Schwartzberg contracted to pay Triton Advisors, Inc. ("TAI") $200,000 as its disposition consultant, Schwartzberg would make the following payments:

| | | |
|---|---|---|
| Schwartzberg | $130,000 | +$43,333.33 |
| Dockser | | 43,333.33 |
| Willoughby | | 43,333.33 |

Schwartzberg would be responsible for paying TAI himself.

      (b)    Allocation of Disposition Fees with Respect to Commercial and Market Rate Properties.

If, in connection with the sale, refinancing or other disposition of any of the Commercial and Market Rate Properties, CRI is entitled to and receives a Disposition Fee, Schwartzberg shall be entitled to receive ten percent (10%) of such Disposition Fee. CRI shall be entitled to the remaining ninety percent (90%) of such Disposition Fee.

By way of illustration, if CRI received a Disposition Fee of $260,000 in connection with the sale of one of its Commercial and Market Rate Properties, and contracted to pay its disposition agent, Capitol Hotel Group, Inc. ("CHG"), $200,0000, CRI would pay Schwartzberg ten percent (10%) of $260,000, or the sum of $26,000. CRI would be responsible for paying CHG itself.

If CRI received a Disposition Fee of $260,000 in connection with the sale of one of its Commercial and Market Rate Properties, and contracted to pay an unaffiliated third party disposition agent like NHP $200,000, CRI would pay Schwartzberg ten percent (10%) of $60,000, or the sum of $6,000.

Section 5.2 Payment of Disposition Fees. Upon the earlier of (a) the receipt of a Disposition Fee by any Disposition Fee Recipient or (b) the sale, refinancing or other event giving rise to the payment of a Disposition Fee, the Disposition Fee Recipient shall prepare a written statement setting forth the total amount of the Disposition Fee earned in connection with the sale, refinancing or other disposition of the subject property, which statement shall specify the sums paid or payable to third parties as costs and expenses, identify such parties by name and address and attach thereto photocpies of invoices, statements or other evidence indicating the amounts paid or payable to third parties. The statement shall estimate the amount payable to each of Dockser, Willoughby and Schwartzberg. The Disposition Fee

10

Recipient shall deliver to each of Dockser, Willoughby and Schwartzberg a copy of the foregoing statement and shall use all reasonable efforts to finalize and pay sums due to third parties within twenty (20) days of the receipt of the Disposition Fee. The obligation to make payment of Disposition Fees shall be limited by the provisions of Sections 5.3(c), 8.2, 8.3 and 8.4. The Disposition Fee Recipient shall distribute the Disposition Fee to Schwartzberg, Dockser, Willoughby and itself in accordance with Section 5.1(a) or (b), as the case may be, within thirty (30) days of the Disposition Fee Recipient's receipt of the Disposition Fee.

Section 5.3 <u>Advances of Disposition Fees</u>.

(a)     Notwithstanding the terms of Section 5.2 above, CRI shall pay to Schwartzberg as an advance against the cumulative amount of Disposition Fees payable to Schwartzberg:

(i)     on or before January 31, 1997, the difference, if any, between $125,000 and that portion of the Disposition Fees actually earned and paid to, or with respect to the Schwartzberg Partnerships retained by, Schwartzberg for the period from January 1, 1996 through December 31, 1996, (for the sake of convenience, any payment due under this subsection shall be deemed to be an Advance); and

(ii)     on each subsequent Advance Date, the difference, if any, between $125,000 and the Disposition Fees paid to or with respect to the Schwartzberg Partnerships, retained by Schwartzberg for the immediately preceding Advance Period.

Any payment to Schwartzberg under this Section 5.3(a) shall hereinafter be called an Advance. In no event shall the aggregate amount of the Advances exceed $1,500,000.00. The obligations to make Advances shall be as limited by the provisions of subsections 5.3(b), (c) and (d), as appropriate. Such Advances shall be recoverable in full to the extent available from Disposition Fees and Residuals, subject to certain limitations, and in the manner set forth below in Sections 5.3(c), (d) and (f).

(b)     Notwithstanding the foregoing Section 5.3(a), to the extent that on any Advance Date the aggregate amount of the Disposition Fees paid to Schwartzberg including, with respect to the Schwartzberg Partnerships any Disposition Fees retained by Schwartzberg, except for any Disposition Fees paid to, or retained by, Schwartzberg during the month of such Advance Date (e.g., January or July), if any, plus the aggregate amount of prior Advances paid to Schwartzberg, (the "Aggregate Sum") shall

(i)     equal or exceed the sum determined by multiplying $125,000 by the number of Advance Dates which have occurred through and including such

11

Advance Date (the "Cumulative Maximum Advance Amount"), then no Advance shall be due to Schwartzberg; or

(ii) be less than the Cumulative Maximum Advance Amount, then CRI shall pay to Schwartzberg on such Advance Date the difference, if any, between the Aggregate Sum and the Cumulative Maximum Advance Amount; provided, however, the amount of any Advance due on any Advance Date shall, in no event exceed $125,000.

(c) Notwithstanding the foregoing Sections 5.2 and 5.3(a) and (b), if at any Advance Date the cumulative amount of Advances paid to or, with respect to the Schwartzberg Partnerships, retained by Schwartzberg exceeds the cumulative amount of Disposition Fees, CRI shall retain out of any Disposition Fees payable to Schwartzberg thereafter an amount or amounts up to the amount of the excess of cumulative Advances over cumulative Disposition Fees. CRI's right to recover the amount of its Advances shall extend to any Disposition Fees payable to or, with respect to the Schwartzberg Partnerships, retained by Schwartzberg for any period subsequent to the final Advance Date, June 30, 2002.

(d) With respect to Advances made for the Advance Periods from January 1, 2001 through June 30, 2002 only, CRI shall also be able to recover the amount of such Advances from Residuals payable to, or, with respect to the Schwartzberg Partnerships, retained by Schwartzberg after June 30, 2002 (a "Residual Reduction"). CRI agrees that it shall make a Residual Reduction only to the extent that it pays such amount to CAPREIT. Schwartzberg acknowledges that CAPREIT shall be a third party beneficiary of this provision as to the Residual Reductions.

From January 1, 1997 through June 30, 2002, CRI shall have the right to recover the amount of any Advances from Disposition Fees payable to or, with respect to the Schwartzberg Partnerships, retained by, Schwartzberg to the extent that Disposition Fees paid to, or, with respect to the Schwartzberg Partnerships, retained by, Schwartzberg during that Advance Period exceed $125,000. Any such recovery of Advances from Disposition Fees shall be treated as a reduction in the cumulative amount of Advances and an addition to the cumulative Disposition Fees for purposes of calculations under this Section 5.3.

(e) Solely as a matter of illustration of this Section 5.3, set forth below are examples illustrating the intent of this Article:

(i) Assume Disposition Fees paid to, or, with respect to the Schwartzberg Partnerships, retained by, Schwartzberg during January 1, 1996 through December 31, 1996 are $100,000. The Advance due on January 31, 1997 shall equal $25,000. (($125,000 x 1 Advance Date) - $100,000 = $25,000.) CRI has the right to recover the Advance hereafter pursuant to subsections 5.3(c) and (d).

(ii)    Assume Disposition Fees paid to or, with respect to the Schwartzberg Partnerships, retained by, Schwartzberg during January 1, 1996 through December 31, 1996 are $200,000. The Advance due on January 31, 1997 shall equal $0. (($125,000 x 1 Advance Date) - $200,000 = -$75,000.)

(iii)    Assume the facts in subsection 5.2(e) (i) above and further assume Disposition Fees payable to, or, with respect to the Schwartzberg Partnerships, available to be retained by, Schwartzberg for the period from January 1, 1997 through June 30, 1997 are $150,000. CRI recovered its January 31, 1997 Advance from the last $25,000 otherwise payable to Schwartzberg. The Advance due on July 31, 1997 shall equal $0. (($125,000 x 2 Advance Dates) - ($125,000 + ($150,000 - $25,000)) = $0.)

(f)    CRI shall have no recourse to any assets of Schwartzberg other than as specifically set forth herein to recover Advances made hereunder except to the extent of any fraud by CMS or Schwartzberg or error by any party and Schwartzberg shall have no obligation to repay to CRI any unrecouped Advances other than as provided in this Article Five; provided, however, in the event CRI has recourse to other assets of Schwartzberg as a result of the error of any party, such recourse shall be only to future Advances or Disposition Fees payable to or, with respect to the Schwartzberg Partnerships, available to be retained by, Schwartzberg.

(g)    Upon the execution of this Settlement Agreement, CRI shall pay to CMS the sum of $42,500 as the fee due to CMS in connection with the sale of Park Heights Towers. For purposes of this Settlement Agreement, the foregoing fee shall not be deemed to be a Disposition Fee.

## ARTICLE SIX

## COVENANTS OF SCHWARTZBERG

Section 6.1 Covenants.

Neither Schwartzberg nor any Schwartzberg Affiliate shall:(a) interfere with the business of CRI, Dockser or Willoughby, or a CDW Affiliate; (b) bring a legal action with respect to the interests of CRI, Dockser, Willoughby, or a CDW Affiliate in any partnership or corporation in which any of them or a CDW Affiliate holds a general partner interest or serves as an officer or director, other than to enforce any provisions of this Definitive Settlement Agreement, or the Separate Agreement; (c) engage in any proxy solicitation with respect to any partnership or corporation in which CRI, Dockser or Willoughby, or a CDW Affiliate, holds a general partner interest or serves as an officer or director; or (d) make any statements in writing or in a public forum that are false, defaming, or that malign the reputation of CRI,

13

Dockser, Willoughby, or a CDW Affiliate. Private statements or conversations in a private or social setting shall not be deemed to be statements in a public forum. The parties agree that (x) *bona fide* competition and (y) public policy statements or activities which are generic to the housing industry do not fall within the term "interfere." Examples of clause (y) above are (i) legislative and rulemaking proposals and testimony; (ii) non-profit activities; and (iii) government service; provided that such statements or actions relate primarily to the housing industry and no specific mention is made of CRI, Dockser, Willoughby or a CDW Affiliate.

Schwartzberg represents and warrants that he does not have copies of CRI investor lists in his possession (except insofar as such information has been provided to him since June 12, 1996 by CRI in connection with Residual payments made to Schwartzberg by CRI), and that, except with respect to copies of such lists said by CRI to be at the offices of the law firm of Fried, Frank, he is aware of no copies of such lists in the possession of parties other than CRI. Schwartzberg agrees to request, in writing, that Fried, Frank return all copies of any such investor lists in its possession to CRI, and to use good faith efforts, upon CRI's written request that he do so, to cause any such lists to be returned. If, after the execution of this agreement, Schwartzberg learns that other third parties who received copies of investor lists from him are still in possession of such lists, he agrees to request, in writing, that all such copies be returned, and to use good faith efforts, upon CRI's written request that he do so, to cause any such lists to be returned. Nothing herein shall require the return of any information about investors provided since June 12, 1996 or that may in the future be provided to Schwartzberg by CRI in connection with payments made to Schwartzberg by CRI. Attached hereto as Exhibit W is a list of the names and addresses of friends of Schwartzberg who are investors in CRI-related Investment Partnerships with respect to whom CRI, Dockser and Willoughby agree that Schwartzberg may solicit for new investment opportunities unrelated to the Investment Partnerships without being deemed to violate clauses (a) or (c) hereinabove. If Schwartzberg desires to supplement Exhibit W in the future, any amendments thereto must be agreed upon in a writing executed by CRI, Dockser, Willoughby and Schwartzberg. The parties acknowledge that the list described above is not intended to be an exclusive list of investors with whom Schwartzberg may communicate regarding new investment opportunities without violating clauses (a) or (c) above, but rather is intended to be a safe harbor provision.

Section 6.2    Appendix II sets forth statements that Schwartzberg or a Schwartzberg Affiliate has heretofore made about CRI, Dockser, Willoughby, or the CDW Affiliates (the "Appendix II Statements"). Schwartzberg agrees that neither he nor any Schwartzberg Affiliate shall, in the future, repeat any of the Appendix II Statements or make any statements about CRI, Dockser, Willoughby, or a CDW Affiliate that are similar to the Appendix II Statements. Schwartzberg further agrees that he shall not be involved in any way, unless required by law, with the Edge Partners litigation with CRIIMI MAE, and that he will not voluntarily talk

with plaintiffs' counsel or with plaintiffs in such litigation. Notwithstanding anything to the contrary herein, if Schwartzberg is required to testify in judicial proceedings, mere responding to questions in such judicial proceedings shall not be deemed a violation of this Section 6.2. The parties agree that they waive no rights pursuant to any orders entered in the Edge Partners litigation unless and until the case is settled or any such order is modified or vacated.

Section 6.3  Schwartzberg will not voluntarily initiate discussions with any governmental agency relating to any investigations, or possible investigation, of any actions by CRI, Dockser or Willoughby that are the subject of this Definitive Settlement Agreement.

Section 6.4  Upon the signing of the Definitive Settlement Agreement, Schwartzberg will pay to the CHP's (other than the Schwartzberg Partnerships) the aggregate sum of $30,000 as reimbursement for the administrative, duplicating, and other costs of all of the CHP's resulting from Schwartzberg's efforts to obtain the consents of the partners of such CHP's for Schwartzberg to be designated the Managing General Partner.

Section 6.5

(a)  Schwartzberg agrees that neither he nor any Schwartzberg Affiliate shall cause any payments to be made to any of them (as distinct from payments to unaffiliated third parties) which affect disproportionately the respective interest, residuals or fees (which shall include, without limitation, Disposition Fees) of CRI, Dockser or Willoughby to which they are entitled from any of the private and public partnerships. It is understood that payments to Schwartzberg or any Schwartzberg Affiliate relating to such partnerships pursuant to (x) existing agreements, extensions and renewals thereof, (y) modifications to existing agreements, extensions and renewals thereof, provided the modifications are commercially reasonable; and (z) new agreements, provided the terms are commercially reasonable; are not deemed to be such payments.

(b)  CRI, Dockser and Willoughby acknowledge that Triton Advisors, Inc. is not a Schwartzberg Affiliate for purposes of this Section, and that Schwartzberg may use Triton Advisors, Inc. or any other disposition service consultant in connection with the sale, refinancing or other disposition of any of the Affordable Housing Properties without violating this provision, so long as any payments to such entity do not reduce the amounts of Disposition Fees payable to Dockser and Willoughby hereunder.

(c)  Schwartzberg may receive a fee from purchasers of CRI's Affordable Housing Properties, but not the Affordable Housing Properties with respect to which a Schwartzberg Partnership is the Investment Partnership.

15

## ARTICLE SEVEN

## COVENANTS OF EACH OF CRI, DOCKSER AND WILLOUGHBY

Section 7.1  Neither CRI, Dockser or Willoughby, or any CDW Affiliate shall: (a) interfere with the business of Schwartzberg or a Schwartzberg Affiliate; (b) bring a legal action with respect to the interests of Schwartzberg in any partnership or corporation in which he or a Schwartzberg Affiliate holds a general partner interest or serves as an officer or director, other than to enforce any provisions of this Definitive Settlement Agreement, or the Separate Agreement; (c) engage in any proxy solicitation with respect to any partnership or corporation in which Schwartzberg or a Schwartzberg Affiliate holds a general partner interest or serves as an officer or director; or (d) make any statements in writing or in a public forum that are false, defaming, or that malign the reputation of Schwartzberg or a Schwartzberg Affiliate.  Private statements or conversations in a private or social setting shall not be deemed to be statements in a public forum.  The parties agree that (x) *bona fide* competition and (y) public policy statements or activities which are generic to the housing industry do not fall within the term "interfere." Examples of clause (y) above are (i) legislative and rulemaking proposals and testimony; (ii) non-profit activities; and (iii) government service; provided that such statements or actions relate primarily to the housing industry and no specific mention is made of Schwartzberg or a Schwartzberg Affiliate.

Section 7.2  CRI, Dockser and Willoughby agree to cause each CDW Affiliate in the four Local Partnerships set forth in Exhibit I hereto to withdraw as general partners in each Local Partnership, subject to the receipt of any governmental agency approval so required and any general partner and limited partner consents, if necessary.  The interests of each of the foregoing entities shall be converted to special limited partners.  Schwartzberg shall cause all necessary documentation to be prepared in connection with the foregoing. CRI agrees to pay fifty (50) percent of the direct, out-of-pocket costs (but not legal fees in connection with the solicitation of consents) associated with the consents of the limited partners and governmental agencies; provided, however, such payment by CRI shall not exceed five hundred dollars ($500) per Partnership which is the subject of this Section 7.2.

Section 7.3  Neither CRI, Dockser, nor Willoughby will voluntarily initiate discussions with any governmental agency relating to any investigations, or possible investigation, of any actions by Schwartzberg that are the subject of this Definitive Settlement Agreement.

Section 7.4.  CRI, Dockser and Willoughby each agree that none of them nor any CDW Affiliate shall cause any payments to be made to any of them (as distinct from payments to unaffiliated third parties) which affect disproportionately the

respective interest, residuals or fees (which shall include, without limitation, Disposition Fees) of Schwartzberg to which he is entitled from any of the private and public partnerships. It is understood that payments to CRI, Dockser, Willoughby or any CDW Affiliate relating to such partnerships pursuant to (x) existing agreements, extensions and renewals thereof; (y) modifications to existing agreements, extensions and renewals thereof, provided the modifications are commercially reasonable; and (z) new agreements, provided the terms are commercially reasonable; are not deemed to be such payments.

## ARTICLE EIGHT

### ESCROW

Section 8.1   Simultaneously herewith, Schwartzberg has executed and delivered to the Escrow Agent the Absolute Assignment in the form of Exhibit V attached hereto (the "Assignment"), which includes (i) all of his partnership interests, general and limited, in and to each partnership set forth on Exhibit L attached hereto (which include, without limitation, Schwartzberg's legal ownership of the general partner and limited partner interests and all rights to distributions, residuals and fees (which shall include, without limitation, Disposition Fees) with respect to those partnership interests) (the "Class I Assigned Interests"), and (ii) all of Schwartzberg's rights to distributions, residuals and fees (which shall include, without limitation, Disposition Fees) with respect to his interests in the Partnerships listed on Exhibit M attached hereto (without transferring, however, the legal ownership of the general partner or limited partner interests themselves) (the "Class II Assigned Interests"). The Class I Assigned Interests and the Class II Assigned Interests are free and clear of all pledges, liens or encumbrances thereon and shall remain free and clear of all such pledges, liens and encumbrances thereon except to the extent of any pledges to Oak Tree Investment Company and its assignees, including the Resolution Trust Corp., pursuant to that certain Schwartzberg Absolute Assignment dated September 3, 1993.

Schwartzberg and CRI agree that he may assign or transfer the Class II Assigned Interests only if the assignee or transferee agrees in writing that he, she or it takes title subject to Schwartzberg's assignment of them under this Definitive Settlement Agreement and its Exhibits. Schwartzberg and CRI agree that he may not assign or transfer the Class I Assigned Interests unless and until the Absolute Assignment is delivered to Schwartzberg under the terms of the Escrow Agreement.

Schwartzberg represents and warrants that:

(i)     he is the lawful owner of the Class I Assigned Interests and the Class II Assigned Interests, with full right, title and interest in and to these interests; and

(ii)    no Schwartzberg Affiliate nor any member of Schwartzberg's family owns any interest (directly or indirectly) in the partnerships listed on Exhibit L or Exhibit M hereto; and

(iii)   except for the assignments referenced in the preceding section to Oak Tree Investment Company and the RTC, Schwartzberg has not made any prior assignment, sale or other disposition of the Class I Assigned Interests or the Class II Assigned Interests and Schwartzberg has received no notice of any claim of interest in the Class I Assigned Interests or the Class II Assigned Interests.

Schwartzberg also has executed and delivered herewith to the Escrow Agent a power of attorney in the form attached hereto as Exhibit N.

Schwartzberg has also executed and delivered herewith the Escrow Agreement in the form attached hereto as Exhibit A.

Upon the execution and delivery of this Settlement Agreement, Schwartzberg shall contemporaneously execute and deliver such UCC-1 Financing Statements as CRI, Dockser and Willoughby deem necessary, appropriate or advisable with respect to the Assignment and the interests conveyed thereby, as well as the Power of Attorney. CRI, Dockser and Willoughby shall contemporaneously execute and deliver to the Escrow Agent a UCC-3 Termination Statement with respect to each UCC-1 Financing Statement, which UCC-3 Termination Statements shall be held in escrow by the Escrow Agent in accordance with the terms of the Escrow Agreement. CRI, Dockser and Willoughby shall pay the cost of preparing and recording the UCC-1 Financing Statements.

Section 8.2   Unless and until a Schwartzberg Default, Schwartzberg may retain, subject to his obligations to use such cash distributions, fees (which shall include, without limitation, Disposition Fees) and residuals to fund an escrow account for the benefit of CAPREIT pursuant to Section 4.7(c) of the Separate Agreement, any cash distributions, fees (which shall include, without limitation, Disposition Fees) and residuals in respect of the Class I Assigned Interests and Class II Assigned Interests covered by and assigned by the Assignment and shall be treated as owner of those interests for federal income tax purposes.

Section 8.3   Upon a Schwartzberg Default or a Triggering Schwartzberg Default, there shall not be any further obligation on the part of CRI, Dockser or Willoughby to make any payments to Schwartzberg or his estate under Sections 5.3 and 11.5.

18

Section 8.4  Not by way of affecting any rights, whatever they may be, under the foregoing Sections 8.2 and 8.3, upon a Schwartzberg Default or a Triggering Schwartzberg Default, there shall not be any obligation on the part of CRI, Dockser or Willoughby to make any payments to Schwartzberg or his estate under any provision of this Agreement until there has been an adjudication of the alleged Schwartzberg Default by the Arbitrator pursuant to Section 11.7. By agreeing to Section 8.4, no party waives any right, claim or defense it may have under this Definitive Settlement Agreement, including without limitation those arising under Sections 8.2 and 8.3.

## ARTICLE NINE

## DEFAULTS AND REMEDIES

Section 9.1(a)  In the event of a Triggering Schwartzberg Default, CRI, Dockser or Willoughby shall have the right to deliver to the Escrow Agent a letter of instruction (as provided in the Escrow Agreement), whereupon the Escrow Agent (without investigation) shall deliver all Escrowed Documents (as defined in the Escrow Agreement) to CRI, Dockser or Willoughby in accordance with the requirements of the Escrow Agreement. Schwartzberg, Schwartzberg Affiliates and Schwartzberg's estate will not take any action to interfere with or impede the delivery to CRI, Dockser and Willoughby of the Escrowed Documents.

Section 9.1(b) In the event that CRI, Dockser or Willoughby claim that there has been a Schwartzberg Default (other than a Triggering Schwartzberg Default), the dispute shall be resolved by arbitration in accordance with Section 11.7, which arbitration shall be final and binding on the parties and not subject to any appeals; provided, however, that in any arbitration of a claimed Schwartzberg Default, the Arbitrator shall be required to state in writing that in reaching his or her decision:

(i)     no weight whatsoever was given to the type or materiality of the Schwartzberg Default in relation to the impact on Schwartzberg of the remedies provided for a Schwartzberg Default in this Definitive Settlement Agreement or the Escrow Agreement; and

(ii)    if the Schwartzberg Default is under Section 6.2 or 6.3 of this Definitive Settlement Agreement, that neither the accuracy of Schwartzberg's statement, his belief as to accuracy, nor his intention were given any weight, it being agreed by Schwartzberg that such factors are not relevant.

Schwartzberg agrees that he shall not challenge the Arbitrator's decision in any way, nor shall any Schwartzberg Affiliate or Schwartzberg's estate challenge the Arbitrator's decision in any way. Schwartzberg, Schwartzberg Affiliates and

Schwartzberg's estate will not take any action to interfere with or impede the delivery to CRI, Dockser and Willoughby of the Escrowed Documents.

Section 9.1(c)    Notwithstanding anything herein to the contrary, CRI, Dockser or Willoughby shall be entitled to seek judicial, equitable relief if: (i) Schwartzberg, a Schwartzberg Affiliate and/or Schwartzberg's estate fail to comply with the provisions of the Escrow Agreement or the Absolute Assignment; (ii) Schwartzberg, a Schwartzberg Affiliate and/or Schwartzberg's estate take any action to interfere with or impede the delivery to CRI, Dockser and Willoughby of the Assignment or the Power of Attorney by the Escrow Agent; (iii) Schwartzberg, a Schwartzberg Affiliate and/or Schwartzberg's estate makes, effects or causes an assignment or transfer of the Class I Assigned Interests or Class II Assigned Interests in violation of Section 8.1 hereof; (iv) Schwartzberg, a Schwartzberg Affiliate and/or Schwartzberg's estate challenges the Arbitrator's decision made upon a claim by CRI, Dockser or Willoughby that a Schwartzberg Default has occurred; or (v) the Escrow Agent fails to deliver the Assignment and the Power of Attorney as such may be required in accordance with the terms hereof and/or the Escrow Agreement.

Section 9.2(a)    In the event that Schwartzberg claims that there has been a CDW Default, the dispute shall be resolved by arbitration in accordance with Section 11.7. Such arbitration shall be final and binding on the parties and not subject to any appeals. In any arbitration of a claimed CDW Default, if the Arbitrator finds that there has been a default, the remedy shall be damages as provided by law. In resolving such dispute and in calculating damages, if any, the Arbitrator shall not in any way take into account the remedies provided for herein in the case of a Schwartzberg Default. The parties acknowledge that the two remedies are intended to be different and, further, that no concept of offsets or relative defaults are to be taken into account.

Section 9.2(b)    Notwithstanding anything herein to the contrary, Schwartzberg shall be entitled to seek judicial, equitable relief if there have been assignments by the Escrow Agent based upon a claimed Triggering Schwartzberg Default and Schwartzberg believes that no such default occurred.

Section 9.3 In the event CRI, Dockser or Willoughby send or deliver a letter of instruction to the Escrow Agent, as provided in Section 3.1 of the Escrow Agreement, requesting the delivery of the Escrowed Documents by reason of the occurrence of a Triggering Schwartzberg Default, CRI, Dockser or Willoughby (as the case may be) shall send or deliver a copy of such letter to Schwartzberg contemporaneously with, and in the same manner as, the letter of instruction that was sent or delivered to the Escrow Agent.

ARTICLE TEN

MUTUAL RELEASES

Section 10.1 Releases. Attached hereto and made a part hereof is Exhibit O. It is incorporated herein as if fully restated.

ARTICLE ELEVEN

OTHER TERMS

Section 11.1 Schwartzberg Letter To CRI, Dockser & Willoughby Attached hereto as Exhibit S is the letter delivered simultaneously with the execution of the Solution from Schwartzberg and CMS to CRI, Dockser and Willoughby. CRI, Dockser and Willoughby may make any distribution of the letter, provided, that no statements are made in connection with any distribution of such letter that are inconsistent with Schwartzberg's letter, or would violate Article 7 of this Definitive Settlement Agreement.

Section 11.2 CRI, Dockser and Willoughby Letter of Acknowledgment. Attached hereto as Exhibit T is a letter to be delivered simultaneously with the execution hereof acknowledging the receipt of the letter in the form of Exhibit S from Schwartzberg to CRI, Dockser and Willoughby.

Section 11.3 Designation of NHP. Subsequent to the termination of CMS under the Asset Management Agreement, CRI retained NHP to provide the services substantially provided under such Asset Management Agreement. CRI shall not object to the retention by NHP of Schwartzberg to provide disposition services to NHP with respect to the Affordable Housing Properties so long as any and all discussions, conferences or reports to CRI or the CRI Affiliates pertaining to the Affordable Housing Properties are conducted, handled or prepared by NHP employees and no contact occurs between Schwartzberg or any Schwartzberg Affiliates or their respective employees and CRI or the CRI Businesses, their officers, directors or employees. In the event NHP is terminated by CRI or the agreement between NHP and CRI expires or is assigned in accordance with the terms thereof, or for any reason NHP resigns or is no longer the provider of such services, CRI shall not object to the retention of Schwartzberg by the successor of NHP, subject to the requirement that CRI, its employees and CDW Affiliate do not have to interface with Schwartzberg or Schwartzberg's Affiliates. CRI, Dockser and Willoughby acknowledge that Schwartzberg and/or CMS or other Schwartzberg Affiliates may receive certain information from NHP while subcontracting to perform disposition services for NHP with respect to CRI's Affordable Housing Properties. CRI understands that NHP requires its subcontractors to enter into agreements with it to preserve the confidentiality of information given to the subcontractor. CRI acknowledges that Schwartzberg and/or CMS or other

21

Schwartzberg Affiliates may use such confidential information received from NHP in the course of his or its subcontracting duties (including communicating with HUD or state or local housing finance agencies); provided that (i) the confidential information is not used for any purpose other than negotiating a possible sale or refinancing of the pertinent Affordable Housing Property, and (ii) neither Schwartzberg, CMS nor any other Schwartzberg Affiliate holds itself out to third parties as acting on behalf of CRI, Dockser or Willoughby. Schwartzberg agrees further that it is the intent of the parties that neither Schwartzberg nor any Schwartzberg Affiliate shall attempt to market all or any substantial portion of the CRI Affordable Housing Properties. Schwartzberg, CMS or any Schwartzberg Affiliate shall execute separate confidentiality agreements with NHP identifying the property or limited group of similarly situated properties as to which confidential information may be used to effect a disposition.

Attached hereto and incorporated herein as Exhibit H is a letter from CRI to NHP to be delivered upon the execution of this Definitive Settlement Agreement setting forth the foregoing understanding.

Section 11.4 <u>Termination of Lease</u>. Attached hereto and incorporated hereby as Exhibit P is a Termination of Lease of office space subleased by CMS from CRI located at 11200 Rockville Pike, effective as of May 14, 1996. CMS agrees to execute such termination and to deliver the sum of $13,669 to CRI upon execution of this Definitive Settlement Agreement.

Section 11.5 <u>Property Management Agreements</u>.

(a)    Promptly after the execution hereof, CRI, Dockser and Willoughby shall cause each of the general partners of the Local Partnerships identified on Exhibit Q to confirm that such Local Partnerships are obligated to maintain in full force and effect the property management agreements pertaining to each specified property through June 30, 2002, subject to:  (i) the receipt of any required regulatory or agency approval applicable to the subject property; (ii) the receipt of any required approval or necessary consents of any lenders to the subject Local Partnership; (iii) the continued ownership of the improved real property which is the subject of the management agreement by the Local Partnership; (iv) the continued ownership of the limited partnership interests in the Local Partnership which currently owns the improved real property by the Investment Partnership and all CDW Affiliate general partner(s); (v) the right to terminate the management agreement in accordance with its terms (except on account of the expiration of the term of the management agreement); or (vi) termination of the management agreement by the Local Partnership on account of fraud, willful misconduct or gross negligence of the management agent, its agents or employees (collectively, the foregoing events are the "Termination Events").

22

(b)    If after December 31, 1997 and prior to June 30, 2002, any Management Agreement is terminated because of a sale of the Management Agreement, CRI, Dockser and Willoughby shall pay to Schwartzberg the following amounts in the aggregate (to be prorated on a Management Agreement by Management Agreement basis based upon the amounts set forth in Appendix III) if the Termination Date occurs:

| | | |
|---|---|---|
| (i) | in calendar year 1998 | $400,000 |
| (ii) | in calendar year 1999 | $300,000 |
| (iii) | in calendar year 2000 | $200,000 |
| (iv) | in calendar year 2001 | $100,000 |

Thereafter, there shall be no payments in the event of a termination of any Management Agreement.

Section 11.6    Termination of Agreements:    Upon the execution of this Definitive Settlement Agreement and without any further action, each and every agreement by and between CRI, Dockser, Willoughby, any CRI Business or any CDW Affiliate, on the one hand, and Schwartzberg, CMS or any Schwartzberg Affiliate, on the other hand, are hereby terminated, including but not limited to The Solution, and are of no further force and effect except for the agreements set forth below:

(a)    this Definitive Settlement Agreement, inclusive of all Exhibits; and

(b)    each certificate and agreement of limited partnership or general partnership of each Local Partnership, intermediate tier partnership and Investment Partnership (including the Schwartzberg Partnerships), and of CRICO Finance Limited Partnership, all as amended and as modified by the terms hereof.

Section 11.7   Arbitration

With respect to any  dispute or matter subject to arbitration under Article Nine hereof, such arbitration shall be conducted by, and pursuant to the rules of, the American Arbitration Association.  All arbitration proceedings shall take place in Washington, D.C.  If within twenty (20) days of service of the complainant's notice of claim or complaint, the parties have not mutually agreed to an arbitrator, the arbitrator shall be chosen pursuant to the rules and procedures of the American Arbitration Association.

Section 11.8   Consents and Approvals Among the Parties.

Although CRI, Dockser and Willoughby, on the one hand, and Schwartzberg and CMS, on the other hand, have agreed to terminate their business relationships

23

in substantial part, there are circumstances whereby one or more of them remain as partners in various entities and therefore, a complete termination of their business relationship is not possible. As a result, the parties acknowledge that consents or approvals will be sought by CRI, Dockser, Willoughby, or the CDW Affiliates (collectively, the "CRI Parties") from Schwartzberg or by the Schwartzberg Affiliates (collectively, the "Schwartzberg Parties") from the CRI Parties. The parties agree to follow the procedure set forth below in connection with obtaining or seeking such consents or approvals.

No later than ten (10) days prior to the date specified in the written notice delivered to the party whose consent or approval is sought (the "Consenter"), the party seeking such approval or consent (the "Seeker") shall deliver to the Consenter a statement which sets forth the issue presented, all material facts and circumstances relating to the issue presented, the recommendation of the Seeker and the reasons for making such recommendation. The Consenter shall respond in writing to such request no later than ten (10) days after the date of receipt of the notice by consenting, approving, denying or withholding such consent or approval. To the extent the Consenter requires additional information or material in order to make a determination, such request shall be made in writing to the Seeker prior to the expiration of the ten (10) day period. If the Consenter does not respond to the request for approval or consent within this ten (10) day period, the request shall be deemed granted. All communications pertaining to any requests shall be in writing in order to avoid misunderstandings among the parties and to avoid future disputes.

Section 11.9 <u>Bona Fide Competition</u>. Nothing herein is intended to prevent the parties hereto from <u>bona fide</u> competition with each other or any Schwartzberg Affiliate or CDW Affiliate, as the case may be, of either of them, subject only to the limitations expressly set forth herein.

Section 11.10 <u>Residuals</u>

(a) <u>Payment of Residuals</u>. The Residuals (which shall not include Disposition Fees) due each of CRI, Dockser, Willoughby, and Schwartzberg, will continue to be paid to each of them as a special limited partner or as a general partner, as the case may be, it being agreed that Schwartzberg is entitled to 33.3% of the Residuals and CRI, Dockser and Willoughby are entitled to 66.7% of the Residuals. If CRI, Dockser or Willoughby, or their estates, on the one hand, or Schwartzberg, or his estate, on the other hand, transfers its or his general partner interest to the other of them without the consent of the limited partners in the Schwartzberg Partnerships or the Investment Partnerships or the Local Partnerships, as the case may be, the transferee shall promptly remit to the transferor any distributions received in respect of such transferred interests. Provided, however, the foregoing obligation to remit to the transferor any distributions received in respect of transferred interests shall not be applicable to

the CRI Parties with respect to transfers arising after a Schwartzberg Default (including a Triggering Schwartzberg Default). CRI, Dockser, Willoughby and Schwartzberg each hereby (i) acknowledge that fifty percent (50) of their respective Residuals heretofore have been assigned to Oak Tree Investment Company ("OTIC"), and (ii) agree to transmit fifty percent (50%) of any Residuals to OTIC or its successor (with a copy of the check delivered to the other party) contemporaneously with the payment of the remaining Residuals as set forth in the first sentence of this paragraph.

      (b)   <u>Put Option.</u> If CRI, Dockser and Willoughby enter into an agreement to sell (including an installment sale) more than ninety percent (90%) of all of their interests in the Residuals in any one of the following three portfolios (1) the Affordable Housing Properties, (2) the Commercial and Market Rate Properties or (3) the Affordable Housing Properties and Commercial and Market Rate Properties combined, CRI, Dockser and Willoughby shall promptly deliver to Schwartzberg a true and correct copy of such agreement together with their written offer to Schwartzberg either, at their election, (i) to arrange for the purchaser to purchase a comparable percentage of Schwartzberg's Residuals on the same terms and conditions as it purchases the Residuals of CRI, Dockser, and Willoughby, or (ii) to purchase a comparable percentage of Schwartzberg's Residuals themselves on the same economic terms and conditions as in the attached agreement. Schwartzberg shall have thirty (30) days from the date he receives the Dockser/Willoughby offer to accept or reject it in writing. If the offer is accepted, the Residuals shall be sold at a closing to occur either ten (10) days after the acceptance or simultaneously with the closing of the purchase of Dockser and Willoughby's Residuals, at Dockser and Willoughby's election. Schwartzberg agrees that seventy percent (70%) of the proceeds he receives for the sale of his Residuals shall be deposited directly into an investment account to be held under the Escrow Agreement. For purposes hereof, more than ninety percent (90%) of the Residuals means, with respect to any one of the three portfolios, the sale of more than 90% of the Residuals in all of the partnerships included in such portfolio to the same purchaser or its affiliates within a twelve month time period. An option to purchase the Residuals shall be treated as an agreement to sell the Residuals for purposes of this provision, and shall be treated for purposes of this agreement as having been exercised on the date the option is granted, or exercised, at Schwartzberg's election.

      (c)   <u>Purchase from RTC</u>. If CRI or any CDW Affiliate obtains an opportunity to purchase any of the Residuals assigned to the Resolution Trust Corp., Schwartzberg, Willoughby and Dockser shall each be entitled to purchase one-third thereof upon the same terms and conditions obtained by CRI or any CDW Affiliates. If either Willoughby or Dockser declines to avail himself of such purchase, Schwartzberg shall be entitled to purchase one-half (or all if both Willoughby and Dockser decline) of the subject Residuals.

(d)    Information.  Within a reasonable period of time (not to exceed ninety (90) days) after a sale, refinancing or other event that gives rise to any Residuals, CRI shall deliver to Schwartzberg an accounting of all related receipts and distributions.  Schwartzberg shall deliver the same type of accounting to CRI, Dockser and Willoughby on the same terms with respect to any Residuals in connection with any Schwartzberg Partnership.  Each party and his or its representatives shall be entitled to review and copy at their expense the books and records maintained by CRI or Schwartzberg, as the case may be, with respect to such Residuals during regular business hours upon reasonable notice (not less than 72 hours).  If a party discovers any errors in the other's accounting, the parties shall promptly make the appropriate adjustments and shall transfer such funds as may be required to adjust the distributions consistently with the corrected accounting.

## ARTICLE TWELVE

## MISCELLANEOUS

Section 12.1   Expenses.  Except as expressly provided herein, each of the parties hereto shall pay its own expenses and the fees and expenses of its counsel and other representatives and no party shall apply to any court for reimbursement of any other fees and expenses.

Section 12.2   Amendment and Modification.  This Definitive Settlement Agreement and each of the exhibits hereto shall be amended, modified or supplemented only by written agreement of each of the parties hereto and thereto.

Section 12.3   Waiver of Compliance: Consents.  Any failure of any of the parties hereto to comply with any obligation, covenant, agreement or condition herein may be waived by the other party or parties entitled to the benefits thereof only by a written instrument signed by each of the parties granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.  Whenever this Definitive Settlement Agreement or any exhibit requires or permits consent by or on behalf of a party hereto, such consent shall be given in writing in a manner consistent with the requirements for a waiver of compliance as set forth in this Section 12.3.

Section 12.4   Notices.  All notices and other communications hereunder shall be in writing and shall be deemed given upon delivery, regardless whether by

personal delivery, facsimile, courier or mail to the parties at the following addresses (or at such other address for a party as shall be specified by like notice, provided that notices of a change of address shall be effective only upon receipt thereof):

(a)  If to CRI, to

                    C.R.I., Inc.
                    11200 Rockville Pike
                    Rockville, Maryland 20852

                    Attention:  William B. Dockser
                    H. William Willoughby

                    With copies to:

                    Melissa Lackey, Esquire
                    General Counsel
                    C.R.I., Inc.
                    11200 Rockville Pike
                    Rockville, Maryland 20852

and

                    Peabody & Brown
                    1255 23rd Street, N.W.
                    Suite 800
                    Washington, D.C. 20037
                    Attn:  Bruce S. Lane, Esquire

(b)  If to Dockser

                    c/o C.R.I., Inc.
                    11200 Rockville Pike
                    Rockville, Maryland 20852

                    With a copy to:

                    Justine Wilcox, Esquire
                    Peabody & Brown
                    1255 23rd Street, N.W.
                    Suite 800
                    Washington, D.C.  20037

(c) If to Willoughby:

> c/o CRI, Inc.
> 11200 Rockville Pike
> Rockville, MD  20852

With a copy to:

> Debra Yogodzinski, Esquire
> Peabody & Brown
> 1255 23rd Street, N.W.
> Suite 800
> Washington, D.C.  20037

(d) If to Schwartzberg:

> Martin C. Schwartzberg
> c/o Capital Management Strategies,  Inc.
> Suite 220
> 11200 Rockville Pike
> Rockville, Maryland 20852

With a copy to:

> Michael Sanders, Esquire
> Ginsburg, Feldman & Bress, Chartered
> 1250 Connecticut Avenue
> Washington, D.C. 20036

Section 12.5  Assignment.  This Definitive Settlement Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the  parties hereto and their respective successors and permitted assigns, but neither this Definitive Settlement Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without prior written consent of the other parties, nor is this Definitive Settlement Agreement intended to confer upon any other person except the parties hereto any rights or remedies hereunder.

Section 12.6  Consent to Jurisdiction.  Subject to the arbitration provisions of Section 11.7, any action, suit or proceeding arising out of or relating to this Definitive Settlement Agreement instituted by any of the parties hereto shall be brought in any court of the State of Maryland or the United States District Court for the District of Maryland, Southern Division, and the parties hereto hereby irrevocably submit to the exclusive jurisdiction and venue of such courts for the purposes of any such action, suit or proceeding.

28

Section 12.7  <u>Counterparts</u>.  This Definitive Settlement Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 12.8  <u>Interpretation</u>.    The section headings contained in this Definitive Settlement Agreement are solely for the purpose of reference, are not part of the agreement of the parties and shall not in any way affect the meaning or interpretation of this Definitive Settlement Agreement.

Section 12.9  <u>Entire Agreement</u>.  This Definitive Settlement Agreement, including the exhibits hereto and the documents, schedules, certificates and instruments referred to herein, embodies the entire agreement and understanding of the parties hereto with respect to the matters set forth herein.

Section 12.10  <u>Severability</u>.  Any provision of this Definitive Settlement Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceable without invalidating the remaining provisions hereof or affecting the validity or unenforceability of such provision in any other jurisdiction.

[The remainder of this page is intentionally left blank]

29

IN WITNESS WHEREOF, the parties hereto have caused this Definitive Settlement Agreement to be duly executed as of the date first above written:

The Undersigned agree that this document contains all of the essential terms of their Definitive Settlement Agreement and, accordingly, this Definitive Settlement Agreement is intended to be and is legal, binding, and enforceable by the parties hereto, replacing The Solution dated June 12, 1996.

MARTIN C. SCHWARTZBERG

WILLIAM B. DOCKSER

H. WILLIAM WILLOUGHBY

C.R.I., INC.

By: _____
    William B. Dockser
    Chairman of the Board

By: _____
    H. William Willoughby
    President

CAPITAL MANAGEMENT STRATEGIES, INC.

By: _____
    Martin C. Schwartzberg
    President

BOS1: 73088_1

30

## Definitive Settlement Agreement

## EXHIBITS LIST

| | |
|---|---|
| Schedule I | List of Partnerships in which Schwartzberg is a General Partner |
| Schedule II | Affordable Housing Properties |
| Schedule III | Commercial and Market Rate Properties |
| Appendix I | [Reserved] |
| Appendix II | Statements of Schwartzberg |
| Appendix III | Management Agreement Allocations |
| Exhibit A | Escrow Agreement |
| Exhibit B | Separate Agreement |
| Exhibit C | The Solution |
| Exhibit D | [Reserved] |
| Exhibit E | [Reserved] |
| Exhibit F | [Reserved] |
| Exhibit G | [Reserved] |
| Exhibit H | Letter CRI to NHP |
| Exhibit I | Four Local Partnerships in which CRI Affiliate to Withdraw |
| Exhibit J | [Reserved] |
| Exhibit K | Agreement Regarding Partnership Transfers |
| Exhibit L | Class I Assigned Interests |
| Exhibit M | Class II Assigned Interests |

-1-

Exhibit N — Power of Attorney

Exhibit O — Mutual Release

Exhibit P — Termination of Lease

Exhibit Q — Local Partnerships to Retain Property Management

Exhibit R — [Reserved]

Exhibit S — Schwartzberg letter to CRI, Dockser and Willoughby

Exhibit T — CRI Letter of Acknowledgment

Exhibit U — Actions in D.C.

Exhibit V — Absolute Assignment

Exhibit W — Friends of Schwartzberg

BOS1: 74249_1